IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NAC CONSULTING, LLC,                    )
                                        )
    Plaintiff,                          )
                                        )        Civil Action No. 1:22-cv-318 (RDA/IDD)
    v.                                  )
                                        )
3ADVANCE, LLC,                          )
                                        )
    Defendant.                          )

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendant 3Advance, LLC's Motion to Dismiss.

Dkt. 6.  This Court dispensed with oral argument as it would not aid in the decisional process.

*See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J).  The Motion is now fully briefed and ripe

for disposition.  Having considered the Motion, the accompanying Memorandum in Support,

and Plaintiff's Opposition (Dkt. 8), the Court GRANTS-IN-PART and DENIES-IN-PART

Defendant 3Advance, LLC's Motion to Dismiss for the following reasons.

## I. BACKGROUND

### A.  Factual Background[1]

Plaintiff NAC Consulting, LLC, (d/b/a "Cannovate") is a customer service and staffing

agency providing client resource manager ("CRM") data collection and analysis.  Dkt. 1 ¶ 6.

Defendant 3Advance, LLC, develops "software solutions[,]" including "Applications."  *Id.* ¶ 7.

On July 10, 2019, the parties entered into a Master Services Agreement ("MSA").  *Id.* ¶ 8; *see*

*also id.*, Ex. B at 1, 5 (MSA signed on July 10, 2019).  Pursuant to the MSA, 3Advance would

---

[1] For purposes of considering the Motion, the Court accepts all facts contained within the
Complaint as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

provide NAC Consulting with "the services and Deliverables" as described in the parties' "Statements of Work" ("SOW"). Dkt. 1, Ex. B at 2. In return, Plaintiff agreed to pay Defendant a fee of $120,000. Dkt. 1 ¶ 8.

The SOW describes the work that Defendant agreed to perform for Plaintiff. 3Advance sold its services to Cannovate in "increments called 'Sprints.'" *Id.*, Ex. C at 1. Each "Sprint" was a "group of related tasks or functionality based on [] priorities agreed upon between" the parties. *Id.* Each "Sprint" included "collaborative planning, execution by the development team, and a demo/review period," and Defendant had to provide a "deliverable" at the end of each Sprint. *Id.* Defendant's only "deliverable" at the end of each Sprint was "providing the requested level of development services." *Id.* According to the SOW, the deliverables were to be "created for release," meaning they would be created "either for demoing to third parties, further internal testing by [Cannovate], beta testing with a known wider group, or production deployment to the web or respective app stores." *Id.*

The SOW and MSA also imposed other obligations on Defendant. While the MSA disclaimed any warranties not provided for in the MSA, Defendant specifically warranted that it would: (1) "perform its services in a professional manner and in accordance with industry standards;" (2) "assign personnel who are reasonably experienced and qualified to perform its services;" and (3) create deliverables that would "materially conform to the Specifications" upon delivery and for 30 days thereafter. *Id.*, Ex. B at 2. The SOW also stated that "[f]iles containing the work will be available on request at any point during the project, with access provided to the repository containing the source code." *Id.*, Ex. C at 2.

According to Plaintiff, Defendant did not meet its obligations under the MSA and SOW. Defendant issued six Sprints between August of 2019 and December of 2019. *Id.* ¶ 13. However,

the App that Defendant provided "failed to perform as the Agreement required." *Id.* ¶ 15. Specifically, Plaintiff could not "demonstrate [the App] to third parties, internal/beta test [it] to a wider group, or deploy [it] to the web or respective app stores." *Id.* Moreover, Defendant only assigned one developer to the project. *Id.* ¶ 16. Finally, 3Advance did not provide the App's "materials and coding[,]" which were "necessary to access and develop the App." *Id.* ¶ 17.

As a result, Plaintiff had to turn to a third-party App developer. That developer, BizTransights, "reached out to work with Defendant." *Id.* ¶ 19. But 3Advance "failed to materially assist" BizTransights, and BizTransights had to "reverse engineer the Deliverables to understand the code and repair the App to achieve requisite functionality level." *Id.* Plaintiff paid BizTransights a fee of $147,000 to create a "Beta-testing-level-CRM-app." *Id.* ¶ 20.

### B. Procedural Background

Plaintiff filed this Complaint on March 23, 2022. Dkt. 1. Defendant filed its Motion to Dismiss for Failure to State a Claim on May 4, 2022. Dkt. 6. Plaintiff responded to that Motion on May 17, 2022. Dkt. 7. Defendant did not file a reply in support of its Motion to Dismiss.

### II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint. *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). "[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal of the motion is appropriate only if the well-pleaded facts in the complaint "state a claim that is plausible on its face." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all the elements of her claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff].'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315 (E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)). Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb*, 791 F.3d at 508).

## III. ANALYSIS

Defendant argues that Plaintiff's Complaint should be dismissed in its entirety. First, Defendant contends that Plaintiff does not state a valid breach-of-contract claim. Defendant asserts that all its work "had been satisfactorily completed in advance of the Plaintiff pausing the agreement." Dkt 6. at 7. Moreover, Defendant argues that "the agreement between the parties was month-to-month, and because there is no allegation that any of the work during the SOWs was somehow incorrect or invalid," there was no breach. *Id.* Similarly, Defendant avers that there is no unjust enrichment claim because it completed "all of its contractual obligations." *Id.*

Finally, Defendant believes the warranty claims are barred as a matter of law both because the MSA's Warranty section disclaimed all warranties and because Plaintiff "voluntarily paused the agreement before a finalized and finished product beyond the monthly SOWs could be complete." *Id.* at 7-8

Plaintiff disagrees.  It argues that Defendant breached its contractual obligations by failing to provide an app that "perform[ed] as the Agreement required" and by failing to "provide either the App required by the Agreement or the application's 'documents' . . . ." Dkt. 7 at 8. Plaintiff claims that Defendant's arguments to the contrary are factual arguments that the Court cannot consider at the motion-to-dismiss stage. *Id.* at 9-10.  Cannovate further contends that it has pleaded the requisite elements to allege that Defendant was unjustly enriched. *Id.* at 10-11. Finally, Plaintiff maintains that its warranty claims are valid.  First, it contends that the MSA's warranty provision does not disclaim express warranties in the contract.  Second, it argues that any purported warranty disclaimer fails because it omits the word "merchantability" and is inconspicuous and ambiguous. *Id.* at 11-15.

As a threshold issue, the Court must determine what materials are properly before it in the action's current posture.  At the motion-to-dismiss stage, a court may consider documents that are "integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *see also Witthohn v. Federal Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006) (holding that in ruling on a motion to dismiss, a court may consider "official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed").  Accordingly, it follows that a court can properly consider a contract in evaluating a motion to dismiss a contract dispute. *Precision Pipeline, LLC v. Dominion Transmission, Inc.*,

Civil Action No. 3:16-cv-180, 2017 WL 1100903, at \*1 n.1 (E.D. Va. March 23, 2017).

Conversely, "a court may not consider any documents that are outside of the complaint, or not

expressly incorporated therein, on a motion to dismiss." *Clatterbuck v. City of Charlottesville*,

708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576

U.S. 155 (2015).

Here, the Court may properly consider both the MSA and the SOW.  Neither party

disputes the authenticity of those documents and they provide the bases for Plaintiff's claims,

making them "integral to the [C]omplaint." *Trimble Navigation Ltd.*, 484 F.3d at 705.  Because

the Court considers those documents at this stage, "[a]ny conflicts between the allegations in the

Complaint and the content of the exhibit are resolved in favor of the exhibit." *Fountain*

*Enterprises, LLC v. Markel Ins. Co.*, 568 F. Supp. 3d 613, 616 n.2 (E.D. Va. 2021).  However,

the Court will not consider other documents that are not "integral" to the Complaint.  For

example, Defendant cites email correspondence between the parties in its Motion to Dismiss.

Dkt. 6 at 6.  That correspondence is collateral and not "integral" to the Complaint, and so the

Court cannot consider it at this stage.

### A. Plaintiff's Claim for Breach of Contract

Defendant first argues that Plaintiff's breach-of-contract claim is barred as a matter of

law.  As both parties recognize, the Court must apply Virginia law in determining whether

Plaintiff has adequately stated a claim for breach of contract.  Dkt. 1, Ex. B § 13 (Virginia law

governs the MSA).  To survive a motion to dismiss, Plaintiff must plead: "(1) a legally

enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that

obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ulloa*

*v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006).  Plaintiff has adequately pleaded those elements.

Under the MSA and SOW, the services that Defendant provided to Plaintiff had to be of a plausible standard.  The MSA required that 3Advance provide Cannovate with "the services and Deliverables" described in the SOW.  Dkt. 1, Ex. B § 1.  The SOW states that the only "deliverable" is that 3Advance would "provide[] the requested level of development services" at the end of each Sprint.  Dkt. 1, Ex. C at 2.  Necessarily, the deliverable that Defendant provided to Plaintiff had to have a specified readiness.  Specifically, the SOW set forth that 3Advance would "prepare deliverables created for release, either for demoing to third parties, further internal testing by your team, beta testing with a wider known group, or production deployment to the web or respective app stores." *Id.*  Put simply, each "deliverable" that Defendant provided to Plaintiff at the end of each "Sprint" had to be made for "release."  And, per the MSA, a deliverable would be created for "release" if it could be demo-ed to third parties, internally tested by Cannovate, beta-tested, or deployed to the web or an app store.

Plaintiff has adequately pleaded that Defendant did not meet its obligation to provide "deliverables created for release."  While Plaintiff's allegations are relatively thin, the Complaint does, at a minimum, allege that the App that 3Advance provided was "unable to perform to third parties, internal/beta test to a wider group, or deploy to the web or respective app stores."  Dkt. 1 ¶ 15.  In other words, while the MSA requires that the deliverable meet at least one of those requirements, Plaintiff alleges that the App that Defendant provided met none of them.[2]  Plaintiff further alleges the inadequacy of Defendant's deliverable by noting that it was "forced to retain

---

[2] It is somewhat unclear whether a deliverable must be able to be demo-ed to third parties, internally tested by Plaintiff, beta tested, *and* deployed to the web or an app store to be "created for release" under the SOW, or whether being able to meet *one* of those requirements is sufficient for Defendant to meet its obligations.  Regardless, Plaintiff alleges that Defendant's deliverable met *none* of those standards.  In any event, it would be inappropriate for the Court to resolve such an ambiguity at this stage.  *Western Refining Yorktown, Inc v. BP Corp. N. America, Inc.*, 618 F. Supp. 2d 513, 523 (E.D. Va. 2009).

another app developer" to address the App's shortfalls.  *Id.* ¶ 18.   As such, Plaintiff has adequately alleged that Defendant breached its obligation to provide "deliverables created for release."

Plaintiff has also alleged that Defendant breached certain other obligations.  Under the MSA, 3Advance was obligated to "assign personnel who are reasonably experienced and qualified" to perform the requested services.  Dkt. 1, Ex. B § 10(b).  Plaintiff alleges that Defendant only had one developer, and no technical writer, assigned to the project.  *Id.* ¶ 16. This allegation is sufficient to allege that Defendant breached its obligation to assign *personnel* to the project, as the plain meaning of "personnel" suggests that multiple persons would be assigned to the project.   *See personnel*, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/personnel (last visited January 11, 2023) (defining personnel as "a body of *persons* usually employed . . . ."); *Travelers Indem. Co. of America v. Portal Healthcare Sol's, LLC*, 35 F. Supp. 3d 765, 770 (E.D. Va. 2014) (stating that "general rules of contract interpretation … require that [a] term be given its plain and ordinary meaning" and noting that "Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning").  Further, the SOW required Defendant to make "[f]iles containing the work . . . . available on request at any point during the project, with access provided to the repository containing the source code."  *Id.*, Ex. C at 2.  But the Complaint alleges that Defendant did not provide "the materials and coding necessary to access and sufficiently develop" the App and did not adequately assist Plaintiff's hired third party (BizTransights) such that BizTransights had to "reverse engineer" the deliverables.  *Id.* ¶ 18.  These allegations are sufficient to create an inference that Defendant breached its obligations to make the files and source code available to Plaintiff.

Defendant's contention that Plaintiff does not have a valid claim for breach of contract is unavailing.  Defendant's lone argument is that the contract was month-to-month and that it "satisfactorily completed" its work each month until Plaintiff paused the agreement.  Dkt. 6 at 7.[3]  It similarly argues that "there is no allegation that any of the work . . . was somehow incorrect or invalid."  *Id.*  However, as set forth above, whether the work was "satisfactorily completed" under the terms of the MSA and SOW is the foundation of Plaintiff's claims.  And while Defendant may believe it abided by the terms of the MSA and SOW and fulfilled its obligations, that is a factual question that is not appropriate for resolution at this stage.  To survive Defendant's Motion to Dismiss its contract claim, all Plaintiff must do is allege facts that support its contention that Defendant breached its contractual obligations.  Plaintiff has successfully done so.

### B. Plaintiff's Unjust-Enrichment Claim

Plaintiff also alleges a claim for unjust enrichment.  To state a claim for unjust enrichment, Plaintiff must allege: "(1) [Plaintiff] conferred a benefit on [] Defendant; (2) [Defendant] knew of the benefit and should reasonably have expected to repay [] Plaintiff; and (3) [Defendant] accepted or retained the benefit without paying for its value."  *James G. Davis Construction Corp v. FTJ, Inc.*, 841 S.E.2d 642, 650 (Va. 2020).

Plaintiff has adequately pleaded an unjust-enrichment claim.  Plaintiff has alleged that it "conferred a benefit" on 3Advance—a fee of $120,000.  Dkt. 1 ¶ 14.  It further alleges that Defendant knew of that payment and "should have reasonably expected to repay" Plaintiff by

---

[3] Defendant also appears to be arguing that it "satisfactorily completed" its work because Plaintiff sent an email that it was "exploring other options."  Dkt. 6 at 6-7.  However, as set forth *supra*, the Court cannot consider such an argument at this stage, as that email is not "integral to the complaint."  *Trimble Navigation Ltd.*, 484 F.3d at 705.

providing it with deliverables that were ready for third-party or beta testing, web deployment, or

app store deployment. *FTJ, Inc.*, 841 S.E.2d at 650.  Finally, Plaintiff alleges that Defendant did

not repay it, and thus "retained the benefit [of $120,000] without paying [Plaintiff] for its value."

*Id.*  While Defendant argues that it "completed all of its contractual obligations," that argument

is once again a factual one that the Court cannot consider.  Rather, what is relevant is that Plaintiff

alleged that the deliverables it received were not worth what it gave to Defendant ($120,000).

Accordingly, Plaintiff's unjust-enrichment claim survives Defendant's motion to dismiss.[4]

### 3. Plaintiff's Warranty Claims

Plaintiff also brings three warranty claims: a claim for breach of an express warranty; a

claim for the breach of implied warranty of merchantability; and a claim for breach of the implied

warranty of fitness for a particular purpose.  Defendant argues that the express-warranty claim

is barred because the MSA disclaims warranties and that both implied-warranty claims fail

because Plaintiff "paused the agreement" before a finalized product could be made.

The Court must first address a threshold issue.  Plaintiff's warranty claims are all rooted

in the Virginia UCC.  *See* Dkt. 1 ¶ 34 (breach of express warranty claim violated § 8.2-313 of

the VUCC); *id.* ¶¶ 37-38 (breach of implied warranty of merchantability claim violated § 8.2-

---

[4]   The Court notes that, under Virginia law, Plaintiff cannot recover on its unjust-enrichment claim if a valid contract governs the parties' relationship.  *See Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Cap. Corp.*, 861 F.2d 489, 491 (4th Cir. 1992) ("One cannot obtain quantum meruit relief from another if he has expressly delineated the contractual obligations the two will have on the subject in question.") (interpreting Virginia law).  However, while Plaintiff may not "recover" under both its unjust-enrichment and breach-of-contract theories, it is not precluded from "pleading" unjust enrichment in the alternative. *Remacle v. Repperio, Inc.*, No. 1:17-cv-434, 2017 WL11505574, at *9-*10 (E.D. Va. Aug. 25, 2017) (interpreting Virginia law).  And while Plaintiff does not expressly state its unjust-enrichment claim is in the alternative, it is not required to do so. *See Millenium Pharmacy Sys., LLC v. Alice Operator, LLC*, No. JKB-16-3467, 2017 WL 1404565, at *2 (D. Md. April 19, 2017) (holding that there is no technical rule of pleading requiring a plaintiff to "expressly state it is pleading alternative theories").  Thus, the Court will permit the unjust-enrichment claim to go forward in the alternative.

314 of the VUCC); *id.* ¶ 42 (breach of implied warranty of fitness for a particular purpose violated § 8.2-315 of the VUCC).  The VUCC, however, only applies to "goods," VA Code Ann. § 8.2-102, which are "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid," VA Code Ann. § 8.2-105(1).  Plaintiff alleges that "[t]he Deliverables form 'goods' under §8.2-105 of Virginia's Uniform Commercial Code ("UCC")."  Dkt. 1 ¶ 30.  But that is a legal conclusion that the Court need not accept as true, and so the Court must independently determine whether the UCC applies to the parties' agreement.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

The contract between Cannovate and 3Advance is best classified as a "mixed" contract, or one that involves both goods and services.  It is true, as Plaintiff notes, that Defendant did have to produce "deliverables" to Plaintiff, which Plaintiff refers to as an "App."  *See* Dkt. 1 ¶¶ 8, 11, 30.  And although the "deliverables" that Defendant created are not tangible, they *could* be classified as goods under the UCC.  For example, some courts have held that software can be classified as a good (and thus subject to the UCC) even though it is intangible and may involve services to create and manage.  *See, e.g.*, *Micro Data Base Sys., Inc v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) (sale of software is a sale of a good); *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985) (services were "incidental" to sale of software such that software was a good under the UCC).  Conversely, the MSA and SOW also require Defendant to render services—for example, the SOW required Defendant to "provid[e] the requested level of deliverable services" to Plaintiff. Dkt. 1, Ex. C.  Those services could be of such a nature to render the agreement a services contract not covered by the VUCC.  *See Tingler v. Graystone*

*Homes, Inc.*, 834 S.E.2d 244, 259 (Va. 2019) (noting that new-home-construction contracts are contracts that are "primarily for services" and thus not covered by the UCC); *Sys. America, Inc. v. Rockwell Software, Inc.* No. C-03-2232, 2007 WL 218242, at *2 (N.D. Cal. Jan. 26, 2007) (contract not covered by the UCC because the "essence" of the contract was the development of software from scratch).

Under Virginia law, to determine whether a "mixed" contract falls under the UCC, a court examines whether goods or services predominate the transaction.[5] In doing so, a court "determine[s] whether the predominant factor is the rendition of service, with goods incidentally involved, or if labor is incidentally involved." *Middle East Broadcasting Networks, Inc. v. MBI Global, LLC*, 689 F. App'x 155, 161 (4th Cir. 2017) (interpreting Virginia law) (cleaned up). To determine whether providing services is the predominant factor, "[t]he Fourth Circuit has deemed the following factors significant . . . : (1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the materials." *Princess Cruises, Inc. v. General Elec. Co.*, 143 F.3d 828, 833 (4th Cir. 1998).[6]

---

[5] The Virginia Supreme Court has "not addressed how to apply [the VUCC] to a contract involving both goods and services." *Valley Proteins, Inc. v. Mid-South Steam Boiler and Engineering Co.*, No. 2:17-cv-19, 2017 WL 11507175, at *4 (E.D. Va. May 12, 2017). However, like many other jurisdictions around the country, Virginia lower courts apply the predominance test. *See, e.g.*, *Lane Const. Corp v. Trading Merchandising Co.*, No. 94000253, 1994 WL 746251, at *1 (Va. Cir. Ct. 1994); *see also Harrison's Moving & Storage Co. v. Princess Anne Paving Corp.*, No.CL00-374, 2002 WL 32075218, at *2 (Va. Cir. Ct. 2002) (collecting cases from Virginia applying the predominance test from *Bonebrake v. Cox*, 499 F.2d 961, 970 (8th Cir. 1974)); Spivey, Gary D., *Applicability of UCC Article 2 to Mixed Contracts for Sale of Consumer Goods and Services*, 1 A.L.R.7th Art. 3 (2015) (noting that the "most widely accepted test" to determine whether mixed contracts are covered by the UCC is the "predominant purpose test").

[6] This Court recognizes that the three-factor test outlined in *Princess Cruises* comes from *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460 (4th Cir. 1985), which interpreted Maryland, not Virginia, law. However, the Virginia Supreme Court has provided no guidance, and lower courts in Virginia have followed the predominance test set forth in

The language of the MSA suggests that it is predominantly a services contract. Indeed, "MSA" stands for Master *Services* Contract, and the parties' obligations are further expanded by the parties' Statement of *Work*. The contract itself repeatedly refers to the "services" that Defendant would provide to Plaintiff, *see, e.g.*, Dkt. 1, Ex. B §§ 1, 2, 3, 10(b), which supports the conclusion that the contract is predominantly for services. *See Princess Cruises*, 143 F.3d at 833 (observing that the documents repeatedly referred to *services* that would be provided in concluding that the transaction was principally for services). The MSA also required that Defendant "perform its services in a professional manner and in accordance with industry standards" and that it would "assign personnel who are reasonable experienced and qualified to perform its services." Dkt. 1, Ex. B, § 10(b). Those provisions indicate that Plaintiff made sure to specifically require that Defendant's service-oriented obligations met a certain standard. Finally, the SOW provides that the actual deliverable is not a "particular functionality" for the App; rather, it is the requested level of development *services* that the parties agree upon. Dkt. 1, Ex. B at 2. This makes clear that the essence of the parties' agreement is that Defendant would provide Plaintiff with a certain standard of services, not a product that would function in a certain manner.

While the nature of Defendant's business may seem to be goods-oriented, the nature of its business in *this* agreement is more akin to services. Plaintiff alleges that Defendant is a developer of "software solutions" and "provides software[,]" delivering to its customer a "prototype of the product" along with all "assets and resources" that are needed to move the

---

*Bonebrake. See, e.g., Princess Anne Paving Corp.*, 2002 WL at *2 (applying the *Bonebrake* rule); *Lane Const. Corp*, 1994 WL 746251, at *1 (same); *W.E. Brown, Inc. v. Pederson Const. Co.*, Law No. 4111, 1990 WL 651408, at *2 (Va. Cir. Ct. 1990) (same). Given that the test in *Princess Cruises* comes from *Bonebrake, see* 143 F.3d at 833 (citing *Bonebrake*), the Court finds the *Princess Cruises* factors persuasive and applies them here.

product along. *Id.* ¶ 7. And, as outlined above, selling software can be considered the sale of a

good. *Dharma Sys., Inc.*, 148 F.3d at 654. However, in this case, the deliverable that Defendant

provided—regardless of whether it is best classified as software, an app, or something else—is

specially made for Plaintiff following consultation between the parties. *See* Dkt. 1, Ex. C at 2

(SOW provides for collaboration between the parties, and deliverable is based on a set of

priorities agreed upon between them). Such specially-designed software is better viewed as a

service, not a good. *See Pearl Investments, LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 353

(D. Me. 2003) ("[D]evelopment of a software system from scratch primarily constitutes a

service."); *Multi-Tech Sys., Inc. v. Floreat, Inc.*, No. Civ.01-1320, 2002 WL 432016, at *4 (D.

Minn. Mar. 18, 2002) ("predominant purpose" of agreements was "to develop and improve" a

product, making the agreements contracts for services, not goods).

Finally, the "intrinsic worth" of what 3Advance provided was its services, not the good

itself. In fact, Plaintiff emphasizes the difficulties it experienced when it engaged BizTransights

to complete the work. Those difficulties arose because "Defendant failed to materially assist"

BizTransights. Put differently, Plaintiff confronted challenges completing the work because

Defendant did not help BizTransights provide the requisite *services* that Plaintiff had originally

engaged 3Advance to perform. This makes clear that the value of the services that 3Advance

provided to Cannovate was relatively more valuable than the "App" that BizTransights ended up

completing, making it more likely that the contract was one for services. *See Marquette Univ v.*

*Kuali*, 584 F. Supp. 3d, 720, 727-728 (E.D. Wis. 2022) ("intrinsic worth" factor weighed in favor

of services contract when Plaintiff "did not have the infrastructure or personnel" to operate the

good provided). In any event, it is difficult for the Court to strongly consider the "intrinsic

worth" factor, as the Court has no way of determining the value of the actual deliverables or

product vis-à-vis the labor or services provided.  *See Grimes v. Young Life, Inc.*, No. 8:16-1410-HMH, 2017 WL 5634239, at \*4 (D.S.C. Feb. 17, 2017) (observing that the court could only "speculate" as to the intrinsic value of the value of the goods and services with limited information about the actual costs).

In sum, applying the *Princess Cruises* factors to the agreement between Cannovate and 3Advance reveals that the MSA is a contract for services.  The language of the contract itself indicates that the primary obligations of 3Advance are service-related; 3Advance's business—in this set of circumstances—are more service-oriented; and the intrinsic worth of 3Advance's services appear to be relatively more valuable than the actual deliverables provided.  Accordingly, the UCC does not apply to the contract here.

Because the UCC does not apply to the agreements between Cannovate and 3Advance, all three of Cannovate's warranty claims fail.  Plaintiff brings its express warranty claim pursuant to section 8.2-313 of the UCC; its implied warranty of merchantability claim pursuant to section 8.2-314 of the UCC; and its implied warranty of fitness for a particular purpose claim under section 8.2-315 of the UCC.  However, as set forth *supra*, the agreement between the parties does not meet the threshold requirement of being a transaction for goods.  As a result, Plaintiff does not have a valid claim against Defendant under sections 8:2-313-315 of the UCC.

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant 3Advance, LLC's Motion to Dismiss is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that Counts III, IV, and V of the Complaint are DISMISSED

WITH PREJUDICE.

The Clerk is directed to forward copies of this Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
January 11, 2023

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge